*EXPERT PENOLOGIST'S REPORT*

*RE*

*ANTOINE WILKINS V. THE DISTRICT OF COLUMBIA*

Prepared by:

E. Eugene Miller
Washington, D.C.
May 28, 2008

INTRODUCTION

I have been retained as an expert in the field of penology by attorney Edward J. Connor, who is representing the plaintiff in the case of *Antoine Wilkins v. The District of Columbia*. I was asked to review various documents and materials in order to determine whether or not officials at the D.C. Central Detention Facility (CDF) complied with generally accepted practices, principles and standards with regard to the assault of Antoine Wilkins on June 14, 2005. If I encountered any apparent conflicts pertaining to the facts of this incident, I was told to assume that the plaintiff's version is accurate.

I respectfully reserve the right to amend and/or supplement this report, should I receive any additional, relevant information. In particular, I have not yet been provided with sufficient information upon which to form opinions on a number of pertinent issues, e.g., classification, staffing, and staff training.

This is the only written report, that I have prepared with regard to the matters in this case. There are no other drafts of this report.

METHODOLOGY

Prior to preparing this report, I reviewed the following documents and materials:

* The "Complaint";
* The defendant's "Answer to Plaintiff's Complaint";
* The plaintiff's "Responses to First Set of Interrogatories and Requests for Documents";
* The defendant's "Answers to Plaintiff's First Set of Interrogatories";
* The defendant's "Responses to Plaintiff's First Set of Requests for the Production of Documents" and the attachments thereto;
* *D.C. Code*, Title 24, Section 221.02(a);
* American Correctional Association, *Performance-Based Standards for Adult Local Detention Facilities, Fourth edition*;
* American Correctional Association, *2006 Standards Supplement*.

In preparing this report I am also relying upon my more than forty-three years of education, training and experience in the field of adult, institutional corrections. This experience has

-2-

included the actual hands-on administration of correctional institutions, including a jail; inspections of/visits to literally hundreds of jails and prisons throughout the United States and twelve foreign countries; participation at the principal conferences in the field; and familiarity with the professional literature in the field. I have also written numerous articles, which have appeared in the principal journals in the field and am the author of a book, entitled *Jail Management*. (Please see the attached resume for details.)

It should also be noted that I am generally familiar with the operation of CDF, dating back to its opening. Over the years, I have made numerous visits to and inspections of various locations within the institution. I also have a general familiarity with many of CDF's security practices, policies and procedures.

SUMMARY OF RELEVANT FACTS

On June 14, 2005, Antoine Wilkins was being held at the CDF on a charge of failure to appear with regard to a cocaine possession charge. He was housed in the South West - 1 (SW-1) cellblock. Another inmate, George Foreman, was also housed in the same cellblock. On June 13, 2005, Mr. Foreman initiated an argument with Mr. Wilkins about the latter's use of the phone. Although heated words were exchanged, there were no blows struck. After the argument, Mr. Wilkins proceeded to engage in his normal routine.

On the morning of June 14, 2008, Mr. Foreman was issued a pass at 9:30 a.m. to allow him to go to his job assignment as a "residential detail helper" in the law library on CDF's second floor. Mr. Wilkins was issued an 11:00 a.m. pass to go to the mental health unit on CDF's third floor. Somehow Mr. Foreman saw Mr. Wilkins in transit on the third floor, left his assignment on the second floor and proceeded to the third floor, where he attacked Mr. Wilkins, stabbing him a total of ten times. The knife used by Mr. Foreman was alternately described by various staff members as a 7" long "street knife" and as a small, black, folding lock-blade knife with a plastic handle with an eagle on it.

FINDINGS AND OPINIONS

*Supervision and Control of Inmate Movement*

-3-

The fact that inmate George Foreman was able to leave his job assignment, either carrying a weapon on his person or retrieving one *en route*, go to another floor, and assault Mr. Wilkins is strongly indicative of a lack of supervision of Mr. Wilkins at his job site and the failure to control inmate movement. How could Mr. Foreman absent himself from his job site with nobody knowing he was gone? How could he go to another floor entirely without authorization without at least being observed by some staff member? The failure to supervise Mr. Foreman and to control his movement from floor-to-floor violate generally accepted practices and principles in the field of penology. Furthermore, the failure to control his movement specifically violates the following national standard:

> "All inmate movement from one area to another is controlled by staff."
> American Correctional Association, Performance-Based *Standards for Adult Local Detention Facilities, Fourth edition*, Standard 4-ALDF-2A-10, page 17.)

The significance of these gross departures from generally accepted practices, principles and standard is that if Mr. Foreman had not been able to leave his job assignment at will, he could not have had access to Mr. Wilkins to assault him. Similarly, if staff had been in control of inmate movement, Mr. Foreman could not have gone from the second to the third floors to assault Mr. Wilkins.

*Control of Contraband*

Incredibly, the weapon used to attack Mr. Wilkins was a store-bought knife, as opposed to a homemade "shank", which is the usual weapon of choice at CDF. This fact means that either someone coming into the jail from the community either ingeniously figured out a way to slip a weapon into the facility or one or more staff CDF staff members were exceedingly careless or complicit. How does staff allow a store-bought knife to get into a major, urban jail undetected? Generally accepted practice and the D.C. Department of Corrections's own regulations require that:

> "Institutional Wardens,...shall establish procedures requiring unannounced, irregularly-timed searches of housing units, program areas, and other areas utilized by inmates."
> (DCDOC, Program Statement 5010.3A, "Contraband Control", March 16, 2001.)

Based upon my own knowledge garnered from CDF records pertaining to other assaults

-4-

around the time of this incident, CDF staff conducted insufficiently frequent searches of housing units and other areas frequented by inmates When shakedowns were conducted, they invariably took place at changes of shift (except in response to a security emergency). This practice violated both generally accepted practice and DCDOC's own policy on the subject of contraband control. Thus, inmates were effectively forewarned of when to expect shakedowns and when the coast would be clear and hid their weapons accordingly. The inadequacy and dangerous ramifications of this practice was repeatedly pointed out to DCDOC and CDF officials in numerous reports by experts in the field, as well as in expert testimony in numerous lawsuits stemming from assaults at the CDF.

The significance of these failures with regard to the control of contraband to this case is that, if proper penological practices had been employed to prevent inmates from possessing weapons, Mr. Foreman would not have had access to a store-bought knife and, therefore, could not have used it to attack Mr. Wilkins.

*Overall Duty To Protect Inmates from Harm*

Both the *D.C. Code* and national correctional standards establish a duty/responsibility for DCDOC and CDF officials to take adequate steps to protect inmates from harm. Specifically, the *D.C. Code* mandates that:

> the Department of Corrections "...provide for the proper treatment, care..." of the persons committed to its institutions.
> (*D.C. Code*, Title 24, Section 211.02(a).)

Similarly, the national standards in the field mandate that:

> "Inmates are not subjected to ...personal injury..."
> (American Correctional Association, *Performance-Based Standards for Adult Local Detention Facilities, Fourth edition,* Standard 4-ALDF-6A-07, page 100.)

It is clear from the facts of this case that CDF officials did not take the appropriate steps to afford Mr. Wilkins a reasonable degree of protection from harm, resulting in the injuries he received during an attack by another inmate with a store-bought knife on June 14, 2005.

-5-

## STATEMENT OF REMUNERATION

I am being compensated at the rate of $200.00 per hour for time spent reviewing documents and materials pertaining to this case and preparing this report. My fee for time spent testifying at a deposition would be $200.00 per hour door-to-door. My fee for time spent testifying at a trial would be $200.00 per hour with the proviso that any time spent testifying would be billed as a full eight hour day. To date I have received payment of $1,600.00. There is no invoice currently outstanding.

E. Eugene Miller

Date: May 28, 2008